# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

NO. 03-05-00532-CV

**In the Matter of J. J.**

**FROM THE DISTRICT COURT OF TRAVIS COUNTY, 98TH JUDICIAL DISTRICT
NO. J-25,414, HONORABLE W. JEANNE MEURER, JUDGE PRESIDING**

## M E M O R A N D U M   O P I N I O N

J. J., a juvenile, was adjudicated delinquent based on a negotiated plea of true to the allegation of possession of two ounces of marihuana or less. After a hearing, the trial court placed J. J. on probation. J. J. complains on appeal that the district court abused its discretion by requiring as a condition of probation that he enroll in a short-term residential drug treatment program.[1] J. J. argues that the record did not support that placement, but instead favored an outpatient treatment program. Finding no abuse of discretion, we affirm the district court's order of disposition.

Juvenile courts have broad discretion when determining the disposition of a juvenile found to have engaged in delinquent conduct. *In re A.I.*, 82 S.W.3d 377, 379 (Tex. App.—Austin 2002, pet. denied). Our review of a juvenile court's decision is limited to whether the court abused

---

[1] The disposition hearing was conducted by Associate Judge Leonard Ray Saenz, who recommended the disposition later signed by Associate Judge William D. King and approved by Judge W. Jeanne Meurer.

its discretion by acting in an unreasonable or arbitrary manner. *See id*. at 379-80 (citing *In re C.L.*, 874 S.W.2d 880, 886 (Tex. App.—Austin 1994, no writ)). As part of that review in this appeal, we will assess whether the disposition order is supported by legally and factually sufficient evidence under the standards used in criminal cases. *In re C.C.*, 13 S.W.3d 854, 858 (Tex. App.—Austin 2000, no pet.). Before ordering a juvenile to be placed outside of his home during a period of probation, the court must find that the child cannot be provided the quality of care and level of support and supervision at home that the child needs to meet the conditions of the probation. Tex. Fam. Code Ann. § 54.04(c) (West Supp. 2005). When assessing the legal sufficiency of the evidence underlying such a finding, we view the evidence in the light most favorable to the finding and determine whether any rational trier of fact could have found the elements of the requirement proven beyond a reasonable doubt. *C.C.*, 13 S.W.3d at 858. When reviewing factual sufficiency, we consider and weigh all of the evidence and, if the finding is so against the great weight and preponderance of the evidence as to be manifestly unjust, we set aside the disposition order and remand the case for a new disposition hearing. *Id*. at 859.

The sole sworn witness at the disposition hearing was Jarrett Boykin, J. J.'s probation officer.[2] Boykin testified that J. J. had previously been adjudicated delinquent in Georgia for a felony theft and in Texas for possession of cocaine in March or April of 2005. Boykin became J. J.'s probation officer on April 14, 2005. The instant offense occurred on or about June 11, 2005. Boykin opined that J. J. "probably" had a substance abuse problem, although Boykin had only obtained one

---

[2] The reporter's record of the hearing also includes unsworn statements made by J. J. and his mother in discussions with the court.

urinalysis of J. J.—when he came in for the marihuana charge—and it was clean. Boykin said he had no other urinalyses, at least in part, because J. J. had missed appointments. Boykin testified that J. J. had stated that, although he had used drugs, he had not used any since January 2005.

In the two-and-a-half months between being appointed J. J.'s probation officer and the disposition hearing, Boykin said he had met J. J. in person only once. Boykin testified that he had gone by J. J.'s house twice without finding him. Boykin testified that making contact with J. J. was difficult in part because J. J.'s family did not have a telephone. In unsworn discussions with the court, J. J.'s mother blamed the absence of meetings on transportation difficulties and the lack of set appointments, which had resulted in them appearing at the probation office and not finding Boykin present. Boykin countered that J. J. was supposed to report every Tuesday and had not. J. J. missed an intake procedure for an intensive outpatient program because Boykin could not contact him. Boykin testified that the limited contact made helping J. J. difficult. Boykin testified that he had not had any other problems with J. J. Boykin also testified that J. J. was doing "pretty well" at Austin Can Academy and was working at Albertson's grocery store.

Boykin testified that he recommended a residential treatment program so that J. J. could be monitored and treated. He said that he was not sure if J. J. was a drug user or seller, or whether J. J.'s problems were the result of drug use or other behavioral problems. Boykin opined that J. J.'s mother[3] was in denial about J. J.'s criminal history, his behavioral problems, and any possible drug problem. He testified that J. J. admitted to having friends in gangs. This combination

---

[3] J. J.'s father was assaulted and killed three years before this hearing, two years after being divorced from J. J.'s mother.

of circumstances persuaded Boykin that drug treatment would not be successful if J. J. were allowed to live at home. He recommended a long-term residential treatment program that had an aspect concerning drug dealing and that would offer him and his mother counseling.

J. J.'s psychological evaluation by psychologist Stephen Thorne revealed a history of drug use and behavioral trouble causing difficulties in school. J. J. acknowledged using marihuana beginning at age eleven, averaging twice a week until stopping in January 2005. He drank alcohol occasionally. He also reported having sold crack cocaine. J. J. described his relationship with his mother as "very settled" because they knew how to get along with each other. He said she is "very supportive." He had trouble in school evidenced by attendance, disciplinary, and motivational problems. He failed the seventh grade because of attendance issues. He said he has no friends because he found people untrustworthy. Many of his "associates" are in gangs, although he is not. He reported witnessing multiple stabbings and shootings.

Dr. Thorne concluded that J. J. is "rather susceptible to poor judgment, immaturity, negative peer influence and questionable decision-making. In addition [he] displays very little insight into his behavioral/legal difficulties . . . ." Dr. Thorne opined that therapists should focus on his history of drug/alcohol abuse and affiliation with gang members and that "returning [him] to his former environment without any type of therapeutic intervention will only result in continued legal, behavioral, and/or social difficulties for [him]." If J. J. was not placed in a residential treatment setting, he would need those in his home to "provide strict and intense structure and supervision, where discipline is enforced and consequences of actions are clearly set forth and upheld."

In an unsworn discussion with the court, J. J. denied having a drug use problem or dealing drugs. He blamed his possession arrests on "negative peers." J. J.'s mother asserted that she provided sufficient structure for J. J., that she was aware of his actions and problems, and that she, their pastor, and a male role model were working to correct his behaviors.

On the record at the hearing, the court mulled whether to send J. J. to a short-term residential program for treatment for drug use or to the Texas Youth Commission for drug dealing. The trial court placed J. J. on probation for fourteen months until his eighteenth birthday, September 7, 2006, which marked an extension of his partially served one-year probation term. The court made attendance at a residential drug treatment program until successfully discharged a condition of J. J.'s probation. At the hearing, the court described the short-term program as lasting sixty days.

J. J. argues on appeal that the evidence did not support removing him from his home. He contends that the State did not produce any evidence that he had a drug use problem. He argues that Boykin's difficulty in contacting him does not support removing him from his home. He contends that the more prudent approach would have been to make his first drug treatment program an intensive outpatient program.

The evidence showed that, in the environment surrounding him while he lived at home, J. J. had regular contact with drugs that was not deterred by arrest and probation. J. J. admitted he began using marihuana at age eleven and generally used it twice a week. Even though he reportedly stopped using marihuana in January 2005, he was arrested in possession of marihuana in June 2005 while on probation. The arrest for possession while on probation and the difficulties connecting with Boykin create doubt that an outpatient treatment program offers J. J. the best chance

for success. He regularly used drugs while living at home. Even after he was placed on probation, his mother, their pastor, and a male role model were not able to prevent him from acquiring marihuana. The residential program would provide—in addition to available therapies for drug use, drug sales, and other behavioral issues—separation from the "negative peers" J. J. blames for his current arrest. The residential program would offer an aspect potentially crucial to the success of any therapy that is not available while he is living at home.

In light of the fact that J. J.'s probation for a previous offense failed to prevent or dissuade him from possessing drugs while living at home, we conclude that the record supports a determination that the trial court did not abuse its discretion by ordering J. J., as a condition of his probation for this offense, to complete a short-term residential drug treatment program rather than an outpatient program. We affirm the disposition order.


_____

G. Alan Waldrop, Justice

Before Justices B. A. Smith, Puryear and Waldrop

Affirmed

Filed: April 20, 2006

6